## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Scott Rilley, Michelle Kunza, Venus Colquitt-Montgomery, Jonathon Aldrich, and Kendra Buettner, *on behalf of themselves and those similarly situated*, | Case No. 16-cv-04001-DWF-LIB |
| Plaintiffs, | |
| v. | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| MoneyMutual, LLC, Selling Source, LLC, and PartnerWeekly, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Scott Rilley, Michelle Kunza, Venus Montgomery, Jonathon Aldrich, and Kendra Buettner ("Plaintiffs"), by and through their attorneys bring this class action complaint against MoneyMutual, LLC ("MoneyMutual"), Selling Source, LLC ("Selling Source") and PartnerWeekly, LLC ("PartnerWeekly") (collectively "Defendants"), alleging as follows:

### INTRODUCTION

1. This is a consumer class action against Defendants that arrange payday loans between Minnesotans and payday lenders that violate virtually every substantive provision of Minnesota's payday loan laws.

2. Defendants' loans violate Minnesota law because: they charge interest rates far in excess of the rates allowed under Minnesota law (up to 1,304%); neither Defendants nor the payday lenders are licensed to do business or operate as payday

lenders in Minnesota; and Defendants fail to make loan disclosures required under Minnesota law.

3.      Defendants are well-aware that they are extending payday loans to Minnesotans, as they advertise extensively in Minnesota, including through MoneyMutual and the website www.moneymutual.com, using the celebrity spokesperson Montel Williams, and require loan applicants to disclose their home address when applying for the loan.  Despite reaching out to Minnesotans to offer and arrange payday loans, Defendants make no effort to comply with Minnesota's payday loan laws.

4.      Defendants even broker loans to Minnesotans with payday lenders who have been ordered to cease and desist from lending to Minnesotans by Minnesota regulators. Minnesotans have been harmed by Defendants' illegal practices.

5.      Minnesotans have paid exorbitant and usurious interest and have been trapped in the "cycle of debt" that Minnesota's restrictions on payday loans were designed to prevent.

6.      Despite the blatant illegality of their lending, Defendants have falsely represented on moneymutual.com that their loans comply "with all applicable state and federal laws."

7.      Defendants' conduct violates Minn. Stat. § 47.601, Minnesota's Uniform Deceptive Trade Practices Act (Minn. Stat § 325D.44), Minnesota's Consumer Fraud Act (Minn. Stat. §§ 325F.69 and 8.31), and Minnesota's False Statement in Advertising Act (Minn. Stat. §§ 325F.67 and 8.31).  In addition, by arranging loans to Minnesotans that blatantly and obviously violate Minnesota law, Defendants breached basic common law

duties they owed to their customers, aided and abetted the illegal payday lenders, and engaged in a civil conspiracy to violate Minnesota law.  Defendants were also unjustly enriched by their illegal conduct.

8.     Plaintiffs assert claims on behalf of a class of all Minnesotans affected by Defendants' violations of law for damages, injunctive relief, fees and costs.

## THE PARTIES

9.     Plaintiff Michelle Kunza is a natural person residing in Otter Tail County, Minnesota.

10.     Plaintiff Scott Rilley is a natural person residing in Dakota County, Minnesota.

11.     Plaintiff Venus Colquitt-Montgomery is a natural person who resided in Minnesota at the times relevant to this complaint.

12.     Jonathon Aldrich is a natural person residing in Otsego, Minnesota.

13.     Kendra Buettner is a natural person residing in Minneapolis, Minnesota.

14.     Defendant MoneyMutual, LLC is a Nevada limited liability company that conducts substantial business in Minnesota by advertising in Minnesota and doing business with Minnesotans.  MoneyMutual is a "consumer short term lender" as defined by Minnesota law because it is "an individual or entity engaged in the business of making or arranging consumer short-term loans" and is not "a state or federally chartered bank, savings bank, or credit union."  Minn. Stat. § 47.601, subd. 1(e).

15.     Defendant Selling Source, LLC is a Delaware limited liability company with its principal place of business in Las Vegas, Nevada.  Selling Source is a "consumer

short term lender" as defined by Minnesota law because it is "an individual or entity engaged in the business of making or arranging consumer short-term loans" and is not "a state or federally chartered bank, savings bank, or credit union."  Minn. Stat. § 47.601, subd. 1(e).

16.     Defendant PartnerWeekly, LLC is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  PartnerWeekly is a wholly-owned subsidiary of Selling Source.  PartnerWeekly is a "consumer short term lender" as defined by Minnesota law because it is "an individual or entity engaged in the business of making or arranging consumer short-term loans" and is not "a state or federally chartered bank, savings bank, or credit union."  Minn. Stat. § 47.601, subd. 1(e).

## JURISDICTION

17.     This case was originally filed in Dakota County District Court for the state of Minnesota.  Defendants removed this case asserting jurisdiction under 28 U.S.C. §§ 1441, 1331, 1367 and 1332.

18.     Venue is proper in this District because a substantial part of the events giving rise to the claims occurred in this District.

## MINNESOTA'S EXTENSIVE REGULATION OF PAYDAY LENDING

19.     Payday loans are highly regulated in Minnesota (and most other states) because such loans can trap vulnerable borrowers in a downward spiral of debt, with potentially disastrous consequences for borrowers and the communities in which they live.

20.     The Minnesota Legislature substantially amended Minnesota's Payday

Loan Laws in 2009 to clarify that the laws applied to payday loan transactions consummated online, to provide for a private cause of action, and to add substantial statutory penalties and fee-shifting provisions. *See* Minn. Stat. §§ 47.60 and 47.601. These statutes refer to payday loans as "consumer small loans" and "consumer short term loans."  Minn. Stat. § 47.60, subd. 1(a); Minn. Stat. § 47.601, subd. 1(d).

21.    The amended statutes place strict caps on the amount of interest and fees that such lenders can charge.  *Id.*  For short term loans under $350, the fee and interest caps are:

| $0-$50 | $5.50 |
|---|---|
| $50-$100 | 10% of loan proceeds plus $5 administrative fee |
| $100-$250 | 7% of loan proceeds with a minimum of $10 plus $5 administrative fee |
| $250-$350 | 6% of loan proceeds with a minimum of $17.50 plus $5 administrative fee |

22.    For loans above $350 and less than $1000, Minnesota law caps the annual interest rate at 33%, and caps administrative fees at $25.  *See* Minnesota Attorney General, Beware of Internet Loans, attached as Exhibit A.

23.    Additionally, consumer short-term lenders must be licensed by the Minnesota Department of Commerce before lending to or arranging loans to Minnesotans.  Minn. Stat. § 47.601, subd. 2(a)(3)(i).

24.    Minnesota law further prohibits loan contracts from containing provisions "selecting a law other than Minnesota under which the contract is construed or enforced," "choosing a forum for dispute resolution other than the state of Minnesota," or "limiting class actions against a consumer short-term lender."  Minn. Stat. § 47.601 subd. 2(a)(1)-

(3).

25.     Minn. Stat. § 47.601, subd. 2(c) also requires consumer short term lenders to make disclosures.  It states:

> A consumer short-term loan lender must furnish a copy of the written loan contract to each borrower.  The contract and disclosures must be written in the language in which the loan was negotiated with the borrower and must contain:
>
> (1) the name; address, which may not be a post office box; and telephone number of the lender making the consumer short-term loan;
> (2) the name and title of the individual employee or representative who signs the contract on behalf of the lender;
> (3) an itemization of the fees and interest charges to be paid by the borrower;
> (4) in bold, 24-point type, the annual percentage rate as computed under United States Code, chapter 15, section 1606; and
> (5) a description of the borrower's payment obligations under the loan.

26.     A consumer short term lender who violates the statute is liable to the borrower for "all money collected or received in connection with the loan," actual damages, statutory damages of up to $1,000 per violation, costs and attorneys' fees, and injunctive relief.  *Id.* § 47.601, subd. 6.

27.     The State of Minnesota has devoted considerable resources trying to combat payday lenders who charge usurious interest rates and otherwise violate Minn. Stat. §§ 47.60 and 47.601.

28.     After the Minnesota Legislature amended Minnesota's payday lending laws in 2009, the Minnesota Attorney General's Office brought nine civil enforcement actions

against online lenders who flouted Minnesota's payday loan laws, which resulted in millions of dollars in statutory damages awarded to the State.[1]   The Minnesota Attorney General's Office also engaged in public education efforts regarding the dangers of online payday loans, and issued a publication warning the public about such lenders.   *See* Exhibit A.  In addition, the Minnesota Department of Commerce initiated at least twenty-two administrative actions against online payday lenders who failed to obtain the required license and otherwise violated Minnesota law regarding payday loans.  *See* Exhibit B.

29.     As one of the biggest and most prominent brokers of online payday loans, Defendants are aware or should be aware of Minnesota's strict payday loan laws and the extensive regulatory action taken by Minnesota regulators.  Defendants, however, thumb their noses at these regulators, paying no heed to Minnesota's licensure requirements and even subjecting Minnesotans to loans with payday lenders who have been ordered to cease and desist from lending to Minnesotans.  For example, Defendants brokered a payday loan with one of the plaintiffs in this action and Bottom Dollar Payday after it had been ordered to cease and desist from lending to Minnesotans by the Minnesota Department of Commerce.  *See* Exhibit C.

---

[1] *State of Minnesota v. Jelly Roll Financial, LLC*, No. 19HA-CV-10-1703 (Dakota County, Mar. 31, 2010); *State of Minnesota v. Eastside Lenders, LLC*, No. 19HA-CV-10-1705 (Dakota County, Mar. 31, 2010); *State of Minnesota v. Global Payday Loan*, LLC, No. 27-CV-10-6381 (Hennepin County, Mar. 31, 2010); *State of Minnesota v. Silverleaf Management d/b/a Upfront Cash*, No.330-cv-11-305 (Kanabec County, Sept. 6, 2011); *State of Minnesota v. Flobridge Group LLC*, No. 62-CV-11-7171 (Ramsey County, September 6, 2011); *State of Minnesota v. Sure Advance LLC*, No. 27-CV-11-18350 (Hennepin County, Sept. 6, 2011); *State of Minnesota v. Integrity Advance*, No. 62-CV-11-7168 (Ramsey County, Sept. 6, 2011); *State of Minnesota v. CashCall Inc.*, No. 27-CV-13-12740 (Hennepin County, July 11, 2013).

30.     Defendants' illegal lending practices have resulted in litigation and enforcement actions in other states.  For example, it has been reported that the Consumer Financial Protection Bureau, which has regulatory authority over payday lenders, is investigating Defendants.

31.     Another example is that the Pennsylvania Department of Banking, which administers and enforces Pennsylvania's usury and lender licensing laws, issued an Order against Defendants alleging that Selling Source "engaged in unlicensed activity by assisting lenders to make payday loans to Pennsylvania residents." *See* Exhibit D.  This action resulted in a Consent Agreement and Order wherein Defendants agreed to pay a fine, to cease advertising in Pennsylvania, and to cease doing business with Pennsylvanians. *Id.*

32.     Similarly, the New York Department of Financial Services also entered into a Consent Order with Defendants under which Defendants agreed to, among other things, pay a $2.1 million civil penalty and state in all promotional materials that Defendants' "service is not available in New York or to New York borrowers due to interest rate limits under New York law." *See* Exhibit E.

33.     And, the Oregon Department of Consumer and Business Services found that Selling Source, doing business as MoneyMutual, violated Oregon law "by conducting a business in which it acted as an agent, broker or facilitator of payday loans … without first obtaining a license," and ordered Selling Source to pay a civil penalty and cease and desist its, and its affiliates', violations of Oregon law.  *See* Exhibit I.

34.     The Illinois Attorney General has also sued MoneyMutual for illegal,

unlicensed payday lending.

35.     In addition, customers have sued Defendants privately in class action lawsuits asserting usury and RICO claims against Defendants in other states for the engaging in same practices that are the subject of this action in other states. *Gilbert v. MoneyMutual, LLC, et al*., No 4:13cv-1171 (N.D. Cal. Feb. 11, 2013)*; Pham. v. JPMorgan Chase Bank, N.A., et al*., No. RG12652919 (Alameda County Sup. Ct. Oct. 22, 2012).

## **DEFENDANTS' ILLEGAL PAYDAY LOANS**

36.     Selling Source operates a payday and other short-term lending lead generation business through a number of wholly-owned subsidiaries, including MoneyMutual and PartnerWeekly.  Selling Source is the sole managing member of PartnerWeekly and MoneyMutual.

37.     PartnerWeekly is Selling Source's primary operating subsidiary in connection with payday loans and other short-term lending products, and acts as Selling Source's agent in running www.moneymutual.com.

38.     MoneyMutual is a wholly-owned subsidiary of Selling Source.  It was established to hold the moneymutual.com website.  PartnerWeekly is generally responsible for operations concerning the moneymutual.com website.

39.     Selling Source also owns specialty consumer reporting agency DataX, LTD ("DataX") which provides specialty credit reports that are used by and sold to payday lenders.

40.     Defendants advertise extensively on television broadcast into Minnesota,

using the celebrity Montel Williams as the spokesperson for MoneyMutual.

41.    Defendants have specifically targeted the Minnesota market by purchasing Google AdWords campaigns for "payday loans Minnesota" and "payday loans Minneapolis."

42.    Minnesotans who apply for a loan on moneymutual.com are required to fill out an application that includes their address and how much the borrower would like to borrow.   While Defendants have the technological capability to inform Minnesota borrowers that they do not do business in Minnesota, they choose not to exercise that capability and to instead engage in business transactions involving Minnesotans.

43.    After receiving information about the borrower's identity, address, and requested loan amount, Defendants match Minnesotans with online payday lenders based on the information provided in the application.

44.    Specifically, PartnerWeekly has entered into Lead Purchase Agreements with lenders which provide that the contracting payday lenders will be offered and can acquire leads from PartnerWeekly identifying persons interested in obtaining a payday loan.

45.    The leads offered by PartnerWeekly are created with information submitted by consumers both to the moneymutual.com website and to other websites. PartnerWeekly and Selling Source earn revenue from the sale of these leads.

46.    The MoneyMutual website encourages borrowers to obtain a lender through the use of the website.

**If MoneyMutual isn't a lender, why should I use your web site?**

> You can find a lender for free! Instead of waiting in line or searching for
> lenders, our web site can help make the process finding a lender who can
> meet your needs, faster and easier! Instead of spending hours applying
> individually on several websites, request a loan from multiple lenders at once
> by visiting Money Mutual online marketplace.

https://moneymutual.com/questions

47.    After Defendants match Minnesotans with online payday lenders,
Defendants direct the borrower to the online payday lenders' websites, where the loan
transaction is finalized.

48.    Defendants use a Trident Secure Data system to track their operations,
including tracking the identities of the lenders which ultimately make loans to
Minnesotans.   Defendants use this tracking data to calculate the fees lenders owe
Defendants.

49.    Defendants receive fees from the online payday lenders in connection with
the loans that result from the leads they sell.

50.    Defendants' loans routinely charge interest rates far in excess of those
allowed under Minnesota law.  The moneymutual.com website indicates that "the typical
representative APR range" of its online payday lenders "is somewhere between 261%
and 1304% for a 14 day loan."  These APRs are far in excess of the interest payday
lenders may charge under Minnesota law.  *See* Minn. Stat. § 47.60, subd. 2; Minn. Stat. §
47.601, subd. 2(a)(3)(ii).

51.    Defendants' loans routinely contain other terms and provisions that make
the loans invalid under Minnesota law, including illegal purported class action waivers
and illegal choice of law provisions.

52.     Defendants fail to make required the disclosures required by Minn. Stat. 47.601, subd. 2(c) in connection with its loans.

53.     As a result of the unlicensed payday lenders, illegal rates, illegal terms, and lack of disclosures, Defendants' loans are per se illegal and are void *ab initio*.  *See* Minn. Stat § 47.601, subd. 6(b)(1).

54.     The loans Defendants arrange are illegal, and the representations on moneymutual.com are false and misleading.

55.     Until at least April 30, 2016, Defendants asserted that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws," *See* Exhibit H at page 4.  This statement was false and misleading because Defendants arranged for loans that did not comply with Minnesota law.  Defendants no longer stand by this statement and have removed it from the moneymutual.com website.

56.     Defendants' loans do not abide "by all applicable state and federal laws."

57.     Defendants and their lenders are not licensed to operate in Minnesota.

58.     The Minnesota Department of Commerce publishes a list online of the licensed payday and consumer small loan lenders in Minnesota that is available online at http://mn.gov/commerce/consumers/file-a-complaint/inquiries-and-information/consumer-small-loan.jsp, so it would be easy for Defendants to determine if their loans involve payday lenders who are licensed to operate in Minnesota.  Rather than performing this simple task, Defendants choose to ignore Minnesota law.

59.     Defendants asserted to consumers that "using an APR to represent the fees

12

is not only inaccurate, but also fairly misleading," Exhibit H at page 2. This statement is false and misleading as it encourages consumers to ignore the usurious interest rates on Defendants' loans.

60. Until at least April 30, 2016, the moneymutual.com website claimed that Montel Williams "endorsed MoneyMutual because it helps provide people who have no other short-term cash alternatives, access to lenders who offer payday loans and cash advances" and that he "believes that getting a short term cash loan from MoneyMutual's network of participating lenders can help provide the immediate assistance to avoid expensive fees." Again, Mr. Williams' endorsement has been modified and the website currently states that Mr. Williams "endorsed MoneyMutual because it allows people who have no other short-term cash alternatives to find lenders who offer payday loans and cash advances" and that he "believes that finding a short term cash lender through MoneyMutual's marketplace can help provide the immediate assistance to avoid expensive fees."

61. Until at least April 30, 2016, Montel Williams was quoted on moneymutual.com as stating, "MoneyMutual's online lending network is the only source you can trust for finding a payday loan quickly and easily." Mr. Williams has re-characterized his promise to remove reference to MoneyMutual's online "lending network" and he is now quoted on the moneymutual.com website as stating, "MoneyMutual's online marketplace is a resource you can trust for finding a short term lender quickly and easily."

62. The website further states that Montel Williams "only endorses products

that help people live better in all aspects of their lives."

63.     Defendants received or became aware of numerous complaints from aggrieved Minnesota consumers struggling under the rates, fees, and repayment schedules demanded by MoneyMutual's network of lenders.

64.     A former Selling Source CEO noted at least "55% of the people that come into MoneyMutual are 'repeat clients,'" that its lender clients reported a "60 to 70%" repeat borrower rate, and that special targeting of repeat, "Gold" customers could generate additional revenue for Selling Source if those customers took out additional loans to pay off prior loans.

65.     Indeed, after a consumer takes out one loan through moneymutual.com, Defendants send follow-up emails soliciting the consumer to take out other loans through moneymutual.com.   Defendants also send emails encouraging consumers to finish incomplete applications.

66.     Each of the lenders in Defendants' network benefits from the presence of the other lenders in the network. First, the lenders all benefit from the illusion of legitimacy that they are provided by Defendants' claim that it only works with reputable lenders who follow the law. Second, the lenders benefit from Defendants' claim that consumers using its website will experience efficiencies because they can apply for loans from multiple lenders at the same time, rather than having to fill out numerous individual-lender-specific applications. Third, the lenders benefit from their common affiliation with Selling Source and their ability to use the credit reporting services of DataX because they are able to share information with one another about individual

borrower's loan application and loan payoff histories, thereby being able to assess risk through data-sharing facilitated by DataX. Fourth, the presence of numerous lenders in the network allows each individual lender access to a more diverse portfolio of potential customers than it would be able to garner on its own, allowing each lender to diversify its own portfolio of loan risks. Finally, the lenders in Defendants' network benefit from one another's loans because payday loan borrowers often take out a new loan to pay off a past payday loan. Defendants' centralized lead generation and use of a network of lenders allows the lenders to steer this repeat-business to one another.

## PLAINTIFF SCOTT RILLEY'S ILLEGAL PAYDAY LOAN

67.    On or about April 16, 2013, Scott Rilley applied for a payday loan on moneymutual.com using his personal computer in Apple Valley, Minnesota.

68.    In addition to using his personal computer, Rilley provided his Minnesota home address in Dakota County in the loan application.  Defendants matched Rilley with Bottom Dollar Payday, a/k/a BD PDL Services ("Bottom Dollar Payday").  A copy of its website is attached as Exhibit G.

69.    Bottom Dollar Payday is not licensed to operate as a payday lender in Minnesota and was not so licensed at the time of Rilley's loan.

70.    On April 16, 2013 Defendants, through MoneyMutual, sent Rilley the following email:

**From:** Customer Service <no-reply@moneymutual.com>
**Sent:** Tuesday, April 16, 2013 11:18 AM
**To:** SCOTT RILLEY
**Subject:** Congratulations

You Have Been Matched With a Lender

 MoneyMutual®
Designed With You In Mind.

Exclusively For: | SCOTT RILLEY



### Congratulations!

Dear SCOTT,

Congratulations! You have been matched with BD PDL Services, one of the lenders in the MoneyMutual network. You can contact BD PDL Services directly at 888-702-4208 or by visiting their website.



We're committed to providing the absolute best experience possible. That's why if you need to contact BD PDL Services again, they're only a click away by visiting their website.

We know that there are plenty of choices out there, and we're glad you chose MoneyMutual.

Sincerely,

Jay McMillan
MoneyMutual Customer Service

P.S. Remember, we're always here 24 hours a day, 7 days a week to help you get matched with a lender. If you should need to be matched for another short-term loan in the future, you can visit us online at the MoneyMutual website or call us at 800-809-2138.

\* \* \*

71. Bottom Dollar Payday also charges far more interest than is allowed under Minnesota law, typically 30% of the principal balance every two weeks, which is an annual interest rate of 782%. As explained in Bottom Dollar Payday's "FAQS":

> **How much is the first finance fee? How is it calculated?**
> The first finance fee is typically 30% of your principle loan amount.

Exhibit G at page 7.

72. Bottom Dollar Payday's website then explains that it automatically "rolls over" or "renews" its payday loans so that the finance fee is incurred every two weeks. As it states on its website in the FAQs:

**When do I repay? How do I repay? Do I have to repay it all at once?**
Your repayment is the best part. The minimum required payment is the finance fee which is due on your next pay date. You have the option to pay only the finance fee or to pay the fee plus any increment of $10 or the principal in full. A finance fee will be due each due date that you carry a balance with us. You must phone us no less than three business days prior to your due date to set up a payment arrangement if you would like to pay off or pay down your loan. If we do not hear from you we will simply deduct the finance fee from your bank account. We also accept smaller principal payments on your due dates if your current budget does not allow for a full payoff. You get cash when you need it most and repay when you have it!

Exhibit G at page 6. In other words, the "finance fee" discussed above is not a one-time fee charged by Bottom Dollar Payday. It is a recurring fee that borrowers must pay every two weeks and does not include any part of the principal balance of the loan. Instead, the 30% of the principal balance fee is *pure interest*, and the borrower must make special arrangements for additional payments to pay down the principal balance on the loan. In addition to charging more interest than is permitted under Minnesota law, Bottom Dollar Payday's practice of repeatedly taking interest only payments violates Minnesota's limits on the terms of payday loans, and the prohibition on repeated "renewals" or "roll overs."

73. Moreover, when Defendants arranged the Bottom Dollar Payday loan to Rilley, Bottom Dollar Payday was barred from lending to Minnesotans pursuant to a Cease and Desist Order from the Minnesota Department of Commerce. *See* Exhibit C. According to the Cease & Desist Order, Bottom Dollar Payday is "not licensed by the Department in any capacity" and "does business out of San Jose, Costa Rica and Charlestown, Nevis over the website www.bottomdollarpayday.com." *Id.*

74. The Order found that Bottom Dollar Payday had extended a $500 loan to a

Minnesotan and charged that Minnesotan an annual percentage rate of 608.33%.

75.     Based on these facts, the Order found that Bottom Dollar Payday's lending in Minnesota was illegal, and ordered it to cease and desist.  *Id.*

76.     In addition to enforcement action taken by the Minnesota Department of Commerce, the State of Arkansas also banned Bottom Dollar Payday from extending loans to Arkansans.

77.     Not knowing that Bottom Dollar Payday was an illegal outlaw lender, Rilley received a loan from Bottom Dollar Payday.

78.     Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2 (c) to Rilley.

79.     On April 30, 2013, Bottom Dollar Payday debited $345 from Rilley's Minnesota bank account.

## PLAINTIFF MICHELLE KUNZA'S ILLEGAL LOANS

80.     In late 2010, Plaintiff Michelle Kunza was watching television at her home in Perham, Minnesota when she saw an advertisement for MoneyMutual on television. This advertisement featured the celebrity Montel Williams and offered payday loans.

81.     After seeing this commercial, Kunza called MoneyMutual from her Minnesota telephone number.  The representative who answered the phone instructed Kunza to go to MoneyMutual's website and fill out an application.

82.     As Kunza did not have a computer in her home, she went to the local library in downtown Perham and used the library computer to complete MoneyMutual's online application.

83.     After completing the application, including providing her home address in Perham, PartnerWeekly sold the information she had entered on moneymutal.com, including her address and requested loan amount, to a lender named CashCure.

84.     CashCure used Kunza's personal information to run a credit report on her using DataX.

85.     PartnerWeekly and Selling Source earned revenue from the sale of Kunza's information.  DataX earned revenue from the sale of Kunza's credit report.

86.     Shortly after Kunza completed the MoneyMutual application, a notification came up on the screen that indicated she had been approved for a $400 loan with a payday lender named "CashCure."

87.     CashCure is not and never has been licensed to operate as a payday lender in Minnesota and charged Kunza an annual interest rate of 1,209.06%.

88.     Ten days after Kunza received the loan, CashCure required her to pay a $106 finance charge.

89.     CashCure's loan contract authorized it to automatically renew the loan by debiting the finance charge of $106 from Kunza's bank account, and then to continue debiting this finance charge every two weeks up to four times before any of Kunza's payments would be used to pay down the principal balance of the loan.

90.     The loan agreement contained many terms that are illegal under Minnesota law, including:

    a.      An annual interest rate of more than 33%;

    b.      A clause choosing Delaware law as the applicable law; and

c.      A clause purporting to waive the right to participate in a class action against CashCure.

91.     Kunza paid at least $790.20 to pay off her $400 loan from CashCure.

92.     As the Minnesota Department of Commerce explained to Kunza in a letter, CashCure was later ordered to cease and desist from lending to Minnesotans by the Minnesota Department of Commerce, and was fined $5,000 by the Department for lending to Minnesotans without a license.  Exhibit F.  The letter from the Department of Commerce further explained to Kunza that the loan from CashCure was "void" and suggested to her that she "inform your payday lender of [Minn. Stat. §§ 47.60 and 47.601] if they attempt to collect payment from you."  *Id*.

93.     After Kunza paid off her loan, she found that after paying the usurious interest rates on the loan, she was struggling to keep her head above water financially. Kunza felt she had no choice but to obtain another payday loan, so she contacted MoneyMutual.  MoneyMutual then matched Kunza with a payday lender named Sure Advance, LLC.  This payday lender was not licensed to operate in Minnesota, charged Kunza interest rates far in excess of those allowed under Minnesota law, and imposed other loan terms and conditions that violate the substantive prohibitions in Minn. Stat. § 47.60 and 47.601.  Sure Advance, LLC also pulled a credit report on Plaintiff Kunza from DataX.

94.     After making payments on this second illegal loan, Kunza became trapped in a downward financial cycle where she felt she had no choice but to take out additional payday loans to keep her bills paid, including the payments on her illegal payday loans.

Kunza took out additional payday loans, and her financial situation became unmanageable. Kunza experienced significant financial hardship as a result of these illegal payday loans, which began when she received illegal and usurious payday loans from Defendants.

95. Sure Advance, LLC was later sued by the Minnesota Attorney General's Office for extending loans to Minnesotans that violate Minnesota law. That action ultimately resulted in a Consent Judgment wherein Sure Advance agreed to pay the State $760,000 for its illegal lending practices.

96. In or around February 2011, Defendants also matched Kunza with Bottom Dollar Payday, who loaned $300 to Kunza. Bottom Dollar Payday credited Kunza's checking account with $300 on or around February 15, 2011.

97. As described above, Bottom Dollar Payday was not licensed by the state of Minnesota and barred from lending in Minnesota.

98. On March 4, 2011, March 18, 2011, April 1, 2011, and April 15, 2011, Bottom Dollar Payday debited $90 from Kunza's bank account.

99. In September 2011, debt collector Total Recovery Solutions contacted Kunza repeatedly attempting to collect on the loan from Bottom Dollar Payday. The debt collector asserted that Kunza owed $640.50.

100. After Kunza complained to the Department of Commerce, Total Recovery Solutions ceased collection activity on the loan and forgave the purported balance.

101. Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Kunza for any of the loans they arranged.

## PLAINTIFF VENUS COLQUITT-MONTGOMERY'S ILLEGAL PAYDAY LOAN

102.    Using a computer in Delano, Minnesota, Plaintiff Venus Colquitt-Montgomery applied for a payday loan on Defendants' website in or around May 2017, entering in her Minnesota address and contact information.

103.    Defendants matched Colquitt-Montgomery with FSST Financial Services d/b/a Rushmore Financial.  Defendants sent her an email stating that "a lender is willing to work with you" and provided the contact information for Rushmore Financial with a link where she could "connect with" Rushmore Financial.

104.    Defendants also sent Colquitt-Montgomery another email with the subject line "Welcome to MoneyMutual" which thanked her for choosing the MoneyMutual online marketplace.

105.    Rushmore Financial extended a $350 payday loan to Colquitt-Montgomery, which it deposited into her bank account on May 22, 2017.

106.    Rushmore Financial is not licensed to lend by the state of Minnesota and was not licensed at the time of Colquitt-Montgomery's loan.  Rushmore Financial charges more than twice the amount of interest than what is permitted under Minnesota law.

107.    Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Colquitt-Montgomery in connection with this payday loan.

108.    From June 7, 2017 through November 1 2017, Rushmore made automated

withdrawals from Colquitt-Montgomery's Minnesota bank account totaling $972.13.

109.    Per its website, Rushmore Financial charges annual interest rates of up to 1505.62% and finance charges of $33 per $100 dollars borrowed.

110.    Despite all of these payments, Rushmore Financial continued to assert that Colquitt-Montgomery owed a further balance on her loan.   Only after Colquitt-Montgomery complained to the Minnesota Attorney General did Rushmore Financial agree to waive the remaining balance on her loan.

### PLAINTIFF JONATHON ALDRICH'S ILLEGAL PAYDAY LOAN

111.    Using a computer in Minnesota, Plaintiff Jonathon Aldrich applied for a payday loan on moneymutual.com in or around January 2017, entering in his Minnesota address and contact information.

112.    Defendants matched Aldrich with "Lion Loans" aka MoneyLion of Utah LLC.

113.    Lion Loans is not licensed to make loans in the state of Minnesota and was not licensed at the time of the transaction.

114.    Lion Loans extended a $300 payday loan to Aldrich, which it deposited into his bank account on or around January 10, 2017.

115.    The stated annual interest rate on the loan was 645% with a total payment of $935.51.

116.    Starting on January 20, 2017, Lion Loans made automated withdrawals from Aldrich's bank of $71.98 every two weeks until Aldrich had paid the full amount of $935.51.

117.    Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Aldrich in connection with this payday loan.

## PLAINTIFF KENDRA BUETTNER'S ILLEGAL PAYDAY LOAN

118.    Using a computer in Minnesota, Plaintiff Kendra Buettner applied for a payday loan on moneymutual.com in or around March 2012, entering in her Minnesota address and contact information.

119.    Defendants matched Buettner with United Cash Loans.

120.    United Cash Loans is not licensed to make loans in the state of Minnesota and was not licensed at the time of the transaction.

121.    United Cash Loans was a lender owned and operated by notorious payday lender Scott Tucker.  Tucker's businesses were found to have been routinely arranging loans with interest rates of 600 percent to 700 percent. The FTC obtained a $1.3 billion judgment against Mr. Tucker and Mr. Tucker was convicted and sentenced for 16 years in prison for illegal lending.

122.    United Cash Loans extended a $150 payday loan to Buettner, which it deposited into her bank account on or around March 16, 2012.

123.    The loan automatically renewed every payday with a renewal fee.  After four renewals, the payments would increase to $50 plus the renewal fee.  Per United Cash Loans, a $300 loan with United Cash Loans had a $90 renewal fee.

124.    In 2013, the Minnesota Department of Commerce ordered United Cash Loans to pay a civil penalty of $5,000 in connection with a $300 payday loan made in 2010.  The Department of Commerce noted that United Cash Loans was not licensed in

any capacity found the violation to be "serious and reflect[ing] a disregard for Minnesota law."  Exhibit J.

125.   Defendants did not make any of the disclosures required by Minn. Stat. § 47.601, subd. 2(c) to Buettner in connection with this payday loan.

## CLASS ACTION ALLEGATIONS

126.   Plaintiffs bring this action individually and as a class action pursuant to Federal Rule Civil Procedure 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

127.   The Class is defined as follows:

> All individuals residing in Minnesota who obtained a loan through moneymutual.com or any MoneyMutual-branded website from August 1, 2009 until the present or within the applicable limitations period.

128.   The individuals in the putative class are so numerous that joinder of all members is impracticable.  The number of class members exceeds 1,000.

129.   There are questions of law and fact common to the putative class that predominate over any questions solely affecting individual members, including, but not limited to:

a.   Whether Defendants are consumer short-term lenders;

b.   Whether Defendants' loans charged illegal interest and fees;

c.   Whether Defendants' loans involve unlicensed payday lenders;

d.   Whether Defendants' loans contain illegal terms;

e.   Whether Defendants made the required disclosures in connection with their

loans; and

  f.  The proper measure of damages for class members.

  130. Plaintiffs' claims are typical of those of the putative class.  Defendants' loans are routinely with unlicensed lenders, charge illegal interest and fees, contain numerous illegal terms, and fail to provide the required disclosures in connection with those loans.

  131. Given Plaintiffs' losses, Plaintiffs have the incentive and are committed to the prosecution of this action.  Plaintiffs will fairly and adequately protect the interests of the putative class and have retained as counsel a law firm that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel.  There are no known conflicts between Plaintiffs or class counsel and the class they seek to represent.

  132. This action is maintainable as a class action because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the putative class, which would establish incompatible standards of conduct for Defendants and would be a waste of limited judicial resources.

  133. This action is maintainable as a class action because questions of law and fact common to the putative class predominate over any questions affecting only individual members of the putative class and because a class action is superior to other methods for the fair and efficient adjudication of this action.

  134. This action is maintainable as a class action because Defendants have acted

on grounds generally applicable to the class, thus making injunctive relief and corresponding declaratory relief appropriate with respect to the class as a whole.

**COUNT ONE**
**VIOLATION OF MINN. STAT. § 47.601**
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

135.   Plaintiffs re-allege and incorporate all preceding paragraphs.

136.   Defendants are consumer short-term lenders as defined by Minn. Stat. § 47.601 subd. 1(d).

137.   Defendants are unlicensed, and their loans are with unlicensed lenders, those loans charge interest and fees in excess of that allowed, contain terms that are prohibited by Minn. Stat. § 47.601, subd. 2, and Defendants routinely failed to make the disclosures required by Minn. Stat. § 47.601, subd. 2(c).

138.   Plaintiffs and the Class have been harmed by Defendants' illegal business practices.

**COUNT TWO**
**VIOLATION OF MINN. STAT. § 325F.69**
**(Consumer Fraud Act enforced through Minn. Stat. § 8.31)**
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

139.   Plaintiffs re-allege and incorporate all preceding paragraphs.

140.   In connection with the sale of illegal payday loans, Defendants act, use, or employ fraud, false pretenses, false promises, misrepresentations, misleading statements or deceptive practices with the intent that others rely thereon.

141.    Examples   of   Defendants'   false   pretenses,   false   promises, misrepresentations, misleading statements or deceptive practice include, but are not limited to:

a.    Asserting that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws," *See* Exhibit H at page 4;

b.    Proclaiming that "using an APR to represent the fees is not only inaccurate, but also fairly misleading," thereby undercutting Minnesota law requiring that the APR be disclosed and causing confusion," *Id.* at page 2;

c.    Engaging in the illegal conduct described in Count One.

142.    Plaintiffs and the Class have been harmed as a result of the above practices.

## <u>COUNT THREE</u>
**VIOLATION OF MINN. STAT. § 325D.44**
**(Uniform Deceptive Trade Practices Act)**
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

143.    Plaintiffs re-allege and incorporate all preceding paragraphs.

144.    Defendants:

a.    Assert that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws," *See* Exhibit H at page 4;

b.    Assert to consumers that "using an APR to represent the fees is not only inaccurate, but also fairly misleading,' *Id.* at page 2;

c.    Engage in the conduct described in Count One.

145.    The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it has caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval and certification of Defendants' loans.   The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it has caused the likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with, or certification of Defendants' loans.   The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it constitutes Defendants representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; or that a person has a sponsorship, approval, status, afflation, or connection that the person does not have.

146.    The conduct described herein constitutes "deceptive trade practices" within the meaning of Minnesota law because it constitutes Defendants engaging in conduct which similarly creates likelihood of confusion or of misunderstanding.

147.    Plaintiffs and the Class have been harmed as a result of the above practices.

**COUNT FOUR**
**VIOLATION OF MINN. STAT. § 325F.67**
**(False Statement in Advertising Act enforced through Minn. Stat. § 8.31)**
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

148.    Plaintiffs re-allege and incorporate all preceding paragraphs.

149.    With the intent to induce the public to use its services, Defendants advertise assertions, representations, and statements of fact which are untrue, deceptive, or misleading via television, the internet, and other public mediums.

150.    Examples of Defendants' untrue, deceptive, or misleading assertions, include but are not limited to:

a.    Asserting that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws," *See* Exhibit H at page 4;

b.    Asserting to consumers that "using an APR to represent the fees is not only inaccurate, but also fairly misleading," *Id.* at page 2;

151.    Plaintiffs and the Class have been harmed as a result of the above practices.

## COUNT FIVE
## UNJUST ENRICHMENT
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**
**(Pled in the alternative)**

152.    Plaintiffs re-allege and incorporate all preceding paragraphs.

153.    Defendants receive an impermissible and unearned financial gain from engaging in and facilitating illegal conduct.

154.    Defendants' actions and omissions are unjust and provide MoneyMutual with an impermissible financial gain.

155.    It would be inequitable for Defendants to retain profits, benefits, and other compensation from the practices alleged herein.

## COUNT SIX
## CIVIL CONSPIRACY
**(Asserted on behalf of the individual Plaintiffs and the Class against Defendants)**

156.    Plaintiffs re-allege and incorporate all preceding paragraphs.

157.    Defendants conspired with each other and their network of illegal lenders to unlawfully provide illegal loans prohibited by Minnesota law.

158.  Plaintiffs and the Class were proximately harmed by Defendants' conspiracy.

## COUNT SEVEN
## AIDING AND ABETTING
### (Asserted on behalf of the individual Plaintiffs and the Class against Defendants)

159.    Plaintiffs re-allege and incorporate all preceding paragraphs.

160.    Defendants' network of lenders made illegal loans to Plaintiffs and the Class.

161.    Defendants knowingly assisted, encouraged, or otherwise aided and abetted these lenders in making illegal loans to Minnesotans.

162.    Plaintiffs and the Class were proximately harmed by Defendants' conduct.

## COUNT EIGHT
## ALTER EGO /PIERCING THE CORPORATE VEIL
### (Asserted in the alternative on behalf of the individual Plaintiffs and the Class against Selling Source and PartnerWeekly)

163.    Plaintiffs re-allege and incorporate all preceding paragraphs.

164.    Defendant Selling Source is the alter ego of Defendant MoneyMutual.

165.    Selling Source has comingled its funds with that of MoneyMutual.

166.    Selling Source and MoneyMutual have failed to observe corporate formalities.

167.    Selling Source has treated MoneyMutual's assets as Selling Source's own assets.

168.    Upon information and belief, MoneyMutual is undercapitalized.

169.     The influence and governance of MoneyMutual is and has been with Selling Source, which has complete and absolute control of MoneyMutual.

170.     There is such a unity of interest and ownership between Selling Source and MoneyMutual that Selling Source and MoneyMutual are inseparable from each other and adherence to the fiction of the separateness of these entities would sanction fraud and promote a manifest injustice.

171.     Defendant Selling Source is the alter ego of Defendant PartnerWeekly.

172.     Selling Source has comingled its funds with that of PartnerWeekly.

173.     Selling Source and PartnerWeekly have failed to observe corporate formalities.

174.     Selling Source has treated PartnerWeekly's assets as Selling Source's own assets.

175.     Upon information and belief, PartnerWeekly has been undercapitalized.

176.     The influence and governance of PartnerWeekly is and has been with Selling Source, which has complete and absolute control of PartnerWeekly.

177.     There is such a unity of interest and ownership between Selling Source and PartnerWeekly that Selling Source and PartnerWeekly are inseparable from each other and adherence to the fiction of the separateness of these entities would sanction fraud and promote a manifest injustice.

178.     Based on the activities of Selling Source, the Court should pierce PartnerWeekly's and MoneyMutual's corporate veil.

## **PRAYER FOR RELIEF**

179.   WHEREFORE, Plaintiffs, on behalf of themselves and the putative class, pray for judgment against Defendants as follows:

a.   Certification of this action as a class action on behalf of the putative class;

b.   Designation of Plaintiffs as Class Representatives;

c.   Appointment of Berger & Montague, P.C. as class counsel;

d.   Judgment in favor of Plaintiffs on all counts;

e.   Declaration that the practices complained of herein are unlawful;

f.   Injunction requiring Defendants to cease and desist from engaging in these unlawful practices;

g.   Damages in the form of:

  i.   all money collected or received in connection with the loans;

  ii.   statutory damages of up to $1,000 per violation; and

  iii.   an award of pre-judgment and post-judgment interest as provided by law

h.   Disgorgement of all amounts received by Defendants for Class members' loans;

i.   An award of attorneys' fees and costs; and

j.   Any further remedy the Court may deem just and proper.

Date: March 20, 2018                                  BERGER & MONTAGUE, P.C.

  /s/John G. Albanese
E. Michelle Drake #0387366
John G. Albanese #0395882
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Fax: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

Jeffrey Osterwise (*pro hac vice*)
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-300
Fax: (215) 875-4604
josterwise@bm.net

HEANEY LAW FIRM, LLC
Mark Heaney #0333219
13911 Ridgedale Drive, Suite 110
Minnetonka, MN 55305
Telephone: (952) 933-9655
Fax: (952) 544-1308
mark@heaneylaw.com

ATTORNEYS FOR PLAINTIFFS