| | |
|---|---|
| Scott Rilley, Michelle Kunza, Venus Colquitt-Montgomery, Jonathan Aldrich, and Kendra Buettner, on behalf of themselves and those similarly situated, | Civil No. 16-4001 (DWF/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| MoneyMutual, LLC, Selling Source, LLC, and PartnerWeekly, LLC, | |
| Defendants. | |

---

E. Michelle Drake, Esq., Jeffrey L. Osterwise, Esq., and John G. Albanese, Esq., Berger & Montague, PC; and Mark L. Heaney, Esq., Heaney Law Firm, LLC, counsel for Plaintiffs.

Christina Rieck Loukas, Esq., and Joseph M. Windler, Esq., Winthrop & Weinstine, PA; and Donald J. Putterman, Esq., and Michelle L. Landry, Esq., Putterman Landry & Yu LLP, counsel for Defendants.

---

## INTRODUCTION

This matter is before the Court on the Plaintiffs' motion for class certification.

(Doc. No. 113.)  Defendants' oppose the motion.  For the reasons discussed below, the

Court grants Plaintiffs' motion.

## BACKGROUND

This is a class action brought by Plaintiffs on behalf of all Minnesota residents

who used moneymutual.com or any MoneyMutual-branded website to obtain a payday

loan from August 1, 2009 through the date the Court certifies the Class (the "Class Period"), against Defendants, for violations of Minnesota statutes and common law. (Doc. Nos. 1-2 ("Am. Compl."), 113.) The background facts of this case have been set forth in prior orders and the Court need not fully discuss the facts here. Instead, the Court summarizes and supplements the relevant facts below.

## I.    Defendants' Business

Defendants collectively operate a lead-generating business for various payday lenders. Consumers would go to Defendants' website to fill out an application, and then Defendants would sell the application to lenders. The lenders would independently decide whether to lend consumers money.

Defendants operate the website www.moneymutual.com ("MM Website"). MoneyMutual, LLC holds the MM Website, but has no employees. (Doc. No. 29 ("Madsen Decl.") ¶ 5.) Selling Source is the sole owner of MoneyMutual and PartnerWeekly. PartnerWeekly and Selling Source have shared numerous employees. (Doc. No. 28 ¶¶ 2-4.) Defendants use television and Internet-based advertising, as well as direct marketing to market the MM Website. (Madsen Decl. ¶¶ 5-6; Doc. No. 117 ("Albanese Decl.") ¶ 22, Ex. 2 ("McKay Dep.") at 17, 19-21, 47, 91, 94-95.) Defendants' advertising features celebrity spokesperson Montel Williams. (*Id.*) The MM Website has been active since 2009, and Montel Williams has been the spokesperson for MoneyMutual since its inception. (Albanese Decl. ¶ 22, Ex. 3 at 65-66., Ex. 4, Ex. 5.) Until around October 2016, the MM Website advertised to consumers that they could secure loans "as soon as tomorrow," in amounts up to $1,000;

as of October 2016, the amount changed to $2,500.  (*Id.*, Exs. 7-8.)  The MM Website did not disclose to potential borrowers that MoneyMutual is not licensed in Minnesota or that the loans offered may be illegal in Minnesota.  (*See id.*, Exs. 6-9.)

The MM Website invited consumers to apply for a loan, which involved the consumer providing his or her name, social security number, address, bank account information, military status, income, employment status, e-mail address, phone number, and next payday.  (*Id.*, Ex. 10 ("Maple Dep.") at 21-25.)  These categories of information remained substantially the same during the Class Period.  (*Id.*)

Once MoneyMutual receives an applicant's information via the MM Website, Defendants then connect those leads to Defendants' network of lenders via PartnerWeekly's "automated," "ping tree" system for selling leads.  (Madsen Decl. ¶ 8; McKay Dep. at 30-31.)  This system is based upon lead purchase agreements between PartnerWeekly and the lenders, which include "lead purchase insertion orders" that specify the type of consumer sought by the lender.  (Madsen Decl. ¶ 6; McKay Dep. at 33.)  Once an applicant is matched with a lender, the consumer's web browser is automatically redirected to the lender's website, and the consumer receives an e-mail with the lender's contact information.  (Maple Dep. at 33-35.)  Defendants represent that 30%-60% of leads sold in the industry result in a loan transaction.  (McKay Dep. at 124-126; Albanese Decl. ¶ 22, Ex. 15 ("Madsen Dep.") at 46-47.)

According to a spreadsheet detailing all of the leads sold by Defendants regarding Minnesota consumers, Defendants sold 41,154 leads regarding Minnesota consumers to lenders during the period of September 29, 2009 to October 19, 2017 ("Lead Acquisition

Spreadsheet"). (Albanese Decl. ¶ 3.)[1] Because of duplicate contact information, however, Plaintiffs estimate that there are approximately 27,887 unique Minnesota consumers on the Lead Acquisition Spreadsheet. (*Id.*) Defendants also collected and preserved the banking information, including bank name, routing number, and account number, for all applicants. (*See id.* ¶ 5; ¶ 22, Ex. 16.) Defendants are not licensed to arrange loans in Minnesota. (McKay Decl. ¶ 7; Madsen Decl. ¶ 19.) Neither are the lenders to which they sell leads. According to the MM Website, the loans offered by the lenders have annual interest rates with a "typical representative APR range . . . somewhere between 261% and 1304% for a 14-day loan." (Albanese Decl. ¶ 22, Ex. 9 at PLF-0001227.)

On May 19, 2010, the Attorney General's Office for the State of Minnesota notified MoneyMutual that because it "arrange[s] for payday loans to Minnesota consumers" that it was "subject to the restrictions on payday loans set forth in Minnesota law," and that MoneyMutual was "aiding and abetting lenders that violate Minnesota law." (*Id.*, Ex. 23.) The Attorney General sent the same letter to MoneyMutual in 2012. (*Id.*, Ex. 24.) Defendants did not respond to the Attorney General's letter, and Defendants' counsel represented at the hearing on this motion that Defendants disagree

---

[1]     Presumably because of its size, Plaintiffs did not submit the Lead Acquisition Spreadsheet to the Court, but instead produced an example of the information contained therein. (*See* Albanese Decl. ¶ 22, Ex. 16 (containing Named Plaintiffs' information from the Lead Acquisition Spreadsheet).) Plaintiffs have offered to submit the full spreadsheet for the Court's review. Because Defendants do not contest the Rule 23 numerosity requirement, the Court finds review of the full Lead Acquisition Spreadsheet unnecessary at this time and declines Plaintiffs' offer to submit it.

with the Attorney General's interpretation of the law and facts on this matter.

## II.     Plaintiffs

Plaintiffs are consumer-borrowers and have filed a purported class action against Defendants related to the payday loans.  Plaintiffs Rilley and Kunza have been involved in the litigation since its inception in March 2014; Plaintiffs Aldrich, Buettner, and Colquitt-Montgomery have been involved since March 2018.  Each Named Plaintiff visited the MM Website from a computer in Minnesota, submitted their Minnesota address and banking information, and were matched with a lender that provided a loan with a principal under $1,000.  (Doc. Nos. 138 ("Aldrich Decl.") ¶¶ 6-8, 139 ("Buettner Decl.") ¶¶ 6-9; 140 ("Kunza Decl.") ¶¶ 8-16; 141 ("Colquitt-Montgomery Decl.") ¶¶ 9-12; 142 ("Rilley Decl.") ¶¶ 7-10.)

## III.    Procedural History

Plaintiffs first filed their complaint in Minnesota state court, naming only MoneyMutual as a defendant.  Plaintiffs eventually amended the complaint to add Defendants PartnerWeekly and Selling Source.  (Doc No. 1-2 ("Am. Compl.").)  Defendants then removed the case to this Court and moved to dismiss for lack of personal jurisdiction.  In the August 30, 2017 Order, the Court found the exercise of personal jurisdiction appropriate, but dismissed the RICO claim under Fed. R. Civ. P. 12(b)(6).

On March 21, 2018, Plaintiffs filed their Second Amended Complaint, which added Plaintiffs Jonathon Aldrich, Venus Colquitt-Montgomery, and Kendra Buettner, omitted the previously dismissed claims, and did not add any new claims or theories of recovery.  (Doc. No. 85 ("2d Am. Compl.").)  Defendants moved to dismiss the Second

Amended Complaint again for lack of personal jurisdiction. (Doc. No. 95.) On October 3, 2018, the Court denied Defendants' motion.

Plaintiffs now move the Court for an order certifying this case as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following proposed class of borrowers (the "Class"):

> All individuals residing in Minnesota who (1) received a loan from a lender of $1,000 or less, (2) that required a minimum payment within 60 days of loan origination of more than 25 percent of the principal balance, (3) by using moneymutual.com or any MoneyMutual-branded website, (4) from August 1, 2009 through the date of this Order.

(Doc. No. 113 at 1.) Plaintiffs also move the Court for an order appointing Named Plaintiffs as representatives of the Class and appointing E. Michelle Drake and John G. Albanese of Berger & Montague, P.C., and Mark Heaney of Heaney Law Firm, LLC as Class Counsel ("Proposed Class Counsel").

## DISCUSSION

### I. Legal Standard for Rule 23 Class Certification

"A class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016). To obtain class certification, a party must first meet the requirements of Rule 23(a) by establishing that:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition, plaintiffs seeking certification "must satisfy one of the three subsections of Rule 23(b)."  *Ebert*, 823 F.3d at 477 (quoting *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005)).  The burden is on the plaintiffs to "show[] that the class should be certified and that the requirements of Rule 23 are met."  *Id.* (quoting *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013)).

District courts retain "broad discretion" in determining whether to certify a class. *Id.* (citation omitted).  The court, however, must conduct a "rigorous analysis" to ensure "that the prerequisites of Rule 23(a) have been satisfied."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted); *see also In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612 (8th Cir. 2017), *amended*, 855 F.3d 913 (8th Cir. 2017).  "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 783 (8th Cir. 2016) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).  The Eighth Circuit has noted that "class certification is not the time to address the merits of the parties' claims and defenses."  *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006).  However, "the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove."  *Id.*

## II.    Plaintiffs' Claims

In their Second Amended Complaint, Plaintiffs brought claims for:  (1) violating Minnesota's payday-lending statute, Minnesota Statute § 47.601; (2) violating the Minnesota Consumer Fraud Act ("MCFA"), Minnesota Statute § 325F.69; (3) violating the Minnesota Uniform Deceptive Trade Practices Act ("MDTPA"), Minnesota Statute

§ 325D.44; (4) violating the Minnesota False Statement in Advertising Act ("MFAA"), Minnesota Statute § 325F.67; (5) unjust enrichment; (6) civil conspiracy; (7) aiding and abetting; and (8) alter ego/piercing the corporate veil.  (Doc. No. 85.)  Plaintiffs seek certification on all claims except the MFAA claim.

### A.    Minn. Stat. § 47.601

Minnesota's payday-lending laws apply to "consumer short-term lender[s]" "engaged in the business of making or arranging consumer short-term loans."  The laws limit the interest rates and fees that payday lenders can charge, Minn. Stat. § 47.60, subd. 2(a); restrict the duration of payday loans to no greater than 30 days, *id.*, subd. 2(b); and require payday lenders to be licensed by the Minnesota Commissioner of Commerce., Minn. Stat. § 47.601, subd. 6(b)(1).  At issue here, the laws further require the "consumer short-term lender" to provide each borrower with a set of disclosures, which includes various details about the loan and the borrower's obligations.  *Id.*, subd. 2(c).  The law also has a jurisdictional provision:  "[A] consumer short-term loan transaction is deemed to take place in the state of Minnesota if the borrower is a Minnesota resident and the borrower completes the transaction, either personally or electronically, while physically located in the state of Minnesota."  *Id.*, subd. 5.  To prevail on their Section 47.601 claims, Plaintiffs will need to show that Defendants arranged consumer short-term loans with lenders or failed to make the disclosures required by the payday-lending statutes.

## B.   MCFA and MDTPA

The MCFA prohibits the "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled."  Minn. Stat. § 325F.69, subd. 1.  "Merchandise" includes loans.  *Id.* § 325F.68, subd. 2.  To prevail on their MCFA claims, Plaintiffs will need to show a "causal nexus" between Defendants' conduct in arranging loans with unlicensed lenders and the Class's alleged damages.[2] *See City of Farmington Hills Emp. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 356 (D. Minn. 2012) (identifying causal nexus requirement, and noting that reliance component may be proven by direct or circumstantial evidence).

Under the MDTPA, "a person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  Minn. Stat. § 325D.45.  "Proof of monetary damage, loss of profits, or intent to deceive is not required."  *Id.*

In order to prevail on their MCFA and MDPTA claims, Plaintiffs will need to show that Defendants' violation of Minn. Stat. § 47.601 is a "deceptive" practice under the MCFA and creates a "likelihood of confusion or misunderstanding" under the MDTPA.

---

[2]      Plaintiffs do not seek certification on the theory that two particular misrepresentations on the MM Website were misleading.  (Doc. No. 166 at 11.)

### C.    Unjust Enrichment

"In order to establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001). Plaintiffs bring their unjust-enrichment claim in the alternative.  To succeed on their claim, Plaintiffs will need to show that Defendants were unjustly enriched off of the sale of class members' information to unlicensed lenders.

### D.    Civil Conspiracy and Aiding and Abetting

"To establish civil conspiracy, a claimant must show that two or more people worked together to accomplish (1) an unlawful purpose or (2) a lawful act by unlawful means." *Robert Allen Taylor Co. v. United Credit Recovery, LLC*, Civ. No. A15-1902, 2016 WL 5640670, at *11 (Minn. Ct. App. Oct. 3, 2016) (citing *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950)).  Civil conspiracy is not an independent claim and is instead a theory of liability premised on an underlying tortious act. *Leiendecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 228 n.2 (Minn. 2014). Likewise, aiding and abetting requires:  "(1) the primary tortfeasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 733 (8th Cir. 2015).  To prevail on their civil-conspiracy claim, Plaintiffs will need to show that Defendants conspired with the

lenders to make illegal loans. To prevail on their aiding-and-abetting claim, Plaintiffs will need to show that the unlicensed lenders committed a tort, Defendants knew of the tort, and Defendant substantially encouraged or assisted the unlicensed lenders.

### E. Alter Ego/Piercing the Corporate Veil

There is a "presumption of separateness" between a parent and subsidiary corporation. *Ass'n of Mill & Elevator Mutual Ins. Co. v. Barzen Int'l, Inc.*, 553 N.W.2d 446, 449 (Minn. Ct. App. 1996) (citation omitted). However, "[p]iercing the corporate veil is an equitable remedy that may be applied in order to avoid an injustice." *Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009) (citation omitted). "A court may pierce the corporate veil to hold a party liable for the acts of a corporate entity if the entity is used for a fraudulent purpose or the party is the alter ego of the entity. When using the alter ego theory to pierce the corporate veil, courts look to the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." *Id.* (citations omitted). In order to pierce Defendants' corporate veils, Plaintiffs will need to establish that Selling Source, PartnerWeekly, and MoneyMutual are the alter egos of one another.

## III. Rule 23(a) and (b): Commonality, Typicality, and Predominance

Defendants do not dispute that the proposed class satisfies the numerosity requirement of Rule 23(a); nor do Defendants contest the adequacy of Proposed Class

Counsel.[3]  Instead, Defendants oppose certification on three primary grounds:

(1) Plaintiffs do not adequately represent the interests of the class; (2) Plaintiffs have not

demonstrated that issues relating to disclosures, licensing, causation, reliance, and

damages are susceptible to proof on a class-wide basis, nor do they predominate over

issues affecting individual class members; and (3) a class action is not superior to other

methods for adjudicating the controversy.  The Court considers each of the requirements

for class certification in light of the parties' arguments, below.

A party seeking class certification must establish "that 'there are questions of law

or fact common to the class.'"  *Wal-Mart Stores, Inc.*, 564 U.S. at 349 (quoting Fed. R.

Civ. P. 23(a)(2)).  In *Wal-Mart*, the Supreme Court explained that "[c]ommonality

requires the plaintiff to demonstrate that the class members 'have suffered the same

injury.'"  *Id.* at 349-50 (citation omitted).  More specifically, "[t]heir claims must depend

upon a common contention—for example, the assertion of discriminatory bias on the part

of the same supervisor."  *Id.* at 350.  Further, "[t]hat common contention . . . must be of

such a nature that it is capable of classwide resolution—which means that determination

of its truth or falsity will resolve an issue that is central to the validity of each one of the

claims in one stroke."  *Id.*  Elaborating on this requirement, the Supreme Court explained

---

[3]     Even so, the Court notes that Plaintiffs have demonstrated that Proposed Class
Counsel are experienced and qualified class-action attorneys who are able and willing to
competently and vigorously prosecute the action, thus satisfying the requirements of Fed.
R. Civ. P. 23(g).  Moreover, Plaintiffs have submitted evidence that Defendants sold over
40,000 leads on over 27,000 Minnesotans and approximately thirty to sixty percent of
leads sold resulted in a loan transaction.  (Albanese Decl. ¶ 3.)  Thus, the numerosity
requirement of Rule 23(a)(1) is also satisfied.

that "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted).

Under Rule 23(b)(3), a court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members" in order to certify a class. Fed. R. Civ. P. 23(b)(3). When considering the facts of a given case, "a claim will meet the predominance requirement when generalized evidence proves or disproves the elements of the claim on a class-wide basis, because such proof obviates the need to examine each class member's individual position." *Buetow v. A.L.S. Enters., Inc.*, 259 F.R.D. 187, 190 (D. Minn. 2009) (citation and quotations omitted). The purpose of the predominance requirement is to "achieve economy and efficiency in the settlement of disputes." *Vernon J. Rockler & Co., Inc. v. Graphic Enters., Inc.*, 52 F.R.D. 335, 344 (D. Minn. 1971) (citing Fed. R. Civ. P. 23 advisory committee's note).

Plaintiffs identify several issues that they assert are central to their claims, are capable of class-wide resolution, and predominate over any issues facing only individual class members: (1) whether Defendants are consumer short-term lenders under § 47.601; (2) whether Defendants violated § 47.601 by arranging for loans without obtaining a license, or with unlicensed lenders, or by failing to provide mandatory disclosures; (3) whether Defendants' conduct constitutes a deceptive practice under the MCFA; (4) whether Defendants' conduct creates a likelihood of confusion under the MDTPA; (5) whether Defendants conspired with, and/or aided and abetted the lenders to make illegal loans; (6) whether Selling Source is an alter ego of PartnerWeekly and

MoneyMutual; (7) whether Defendants were unjustly enriched by their allegedly misleading conduct; (8) the amount of statutory damages due to each class member; and (9) the proper scope of any injunctive or declaratory relief. (*See* Doc. No. 166 at 6-7.)

The core of the parties' dispute concerning predominance and commonality is whether the issues of disclosures, reliance, and damages can be proven with generalized evidence on a class-wide basis, or whether evidence involving individual class members will overwhelm the common issues. First, Defendants argue that there is "no method to determine on a class-wide basis what mandatory disclosures were made to each class member." (Doc. No. 161 at 30.) Second, Defendants argue that Plaintiffs will need to show that individual class members relied on Defendants' allegedly misleading conduct. (*Id.* at 31.) Finally, Defendants argue that highly individualized issues relating to damages predominate for three of the five Named Plaintiffs, and likely a significant number of other potential class members. (*Id.* at 41.) The Court disagrees.

As Plaintiffs argue, the key issues of fact and law proposed for class treatment can be addressed through common proof. Although there are some individualized issues, they do not predominate over the common issues for those claims for which certification is sought. As Plaintiffs correctly note, the core of Defendants' liability here is based on their actions relating to the information they provided on the MM Website and their alleged arranging of consumer short-term loans within the meaning of Minn. Stat. § 47.601. Contrary to Defendants' arguments, Minn. Stat. § 47.601 does not require a consumer to rely on any misrepresentation that a lender was licensed. Moreover, Minn. Stat. § 47.601, subd. 2(c), makes clear that all "consumer short-term lenders," including

14

those who "arrange," but do not provide "consumer short-term loans" must provide

consumers with the required disclosures.  The predicate question—whether Defendants

"arrange" "consumer short-term loans"—is a question of law capable of answering on a

class-wide basis.  With respect to the MCFA and MDTPA claims, Plaintiffs proceed on

the same legal theory as with their Section 47.601 claim, and predominating over any

individual issues is the common issue of whether Defendants' arranging of "consumer

short-term loans" is a "deceptive" practice under the MCFA and creates a "likelihood of

confusion or misunderstanding" under the MDTPA.

With respect to the unjust enrichment claim, which Plaintiffs plead in the

alternative, Defendants' liability centers on the common question of whether Defendants

were unjustly enriched by profiting off of the sale of leads to lenders—the same theory

and facts Plaintiff advances under Section 47.601.  *See Khoday v. Symantec Corp.*, Civ.

No. 11-180, 2012 WL 1281600, at *31 (D. Minn. Mar. 13, 2014) ("[C]ourts have

certified unjust enrichment claims where they are based on the same claims that were

certified under consumer protection statutes. . . .  Because Plaintiffs' unjust enrichment

claims arise out of the same conduct as the statutory claims, the Court concludes that

class issues will also predominate regarding whether Defendants were unjustly enriched

at class members' expense.").  With respect to the civil-conspiracy claim, Defendants'

liability hinges on the common questions of whether Defendants and the lenders

conspired to make illegal loans to class members.  And with respect to the

aiding-and-abetting claim, Defendants' liability hinges on whether Defendants' knew

about and substantially assisted the unlicensed lenders in making illegal loans to class

15

members. For both claims, these common questions predominate and can be answered on a class-wide basis. Finally, with respect to Plaintiff's alter ego/piercing the corporate veil theory, common questions predominate concerning Defendants' relationship with each other.

Defendants also argue that although statutory damages are capable of class-wide determination, determination of how much money class members paid to lenders will require individual inquiry. "At class certification, plaintiff must present a likely method for determining class damages, though it is not necessary to show that his method will work with certainty at this time." *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (internal quotation marks omitted). "Calculations need not be exact, but at the class-certification stage . . . any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." *Comcast Corp.*, 569 U.S. at 35 (internal citation and quotation marks omitted). The Supreme Court has also held that certification is proper under Rule 23(b)(3) "when one or more of the central issues in the action are common to the class and can be said to predominate, . . . even though other important matters will have to be tried separately, such as damages . . . ." *Tyson Foods, Inc. v. Bouaphakeo*, -- U.S. --, --, 136 S. Ct. 1036, 1045 (2016).

Defendants are correct that the issue of the amounts that class members paid to the lenders requires an individual inquiry not capable of class-wide resolution. But Plaintiffs also seek other types of damages that are capable of class-wide resolution, including

statutory damages, amounts lenders paid Defendants for leads, and punitive damages.[4]

Moreover, Plaintiffs have proposed a feasible method for measuring the amounts that class members paid to the lenders. Specifically, Plaintiffs have demonstrated that by using the Lead Acquisition Spreadsheet, it is possible to track the sale of an individual consumer's information to a lender, and then cross-reference that with the consumer's bank records. By using this two-step process, it is possible to determine the amounts that class members paid to the lenders. The Court finds that although Plaintiffs' proposed process requires individual inquiry, it is less consuming than issues requiring individual testimony and will not overwhelm the liability and damages issues capable of class-wide resolution. The Court therefore concludes that damages are sufficiently measurable on a class-wide basis, and individual damages issues will not predominate.

In sum, Plaintiffs have identified "questions of law or fact common to the class" that are capable of class-wide resolution. *See* Fed. R. Civ. P. 23(a)(2). These common questions also predominate over any questions affecting only individual members. The Court therefore concludes that Plaintiffs have satisfied the commonality and predominance requirements of Rule 23(a)(2) and Rule 23(b)(3), respectively.

Class certification also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "This requirement is generally considered to be satisfied if the claims or defenses of the

---

[4] Defendants have appealed Magistrate Leo I. Brisbois's order granting Plaintiffs' motion to amend the pleadings to add a claim for punitive damages. (Doc. Nos. 215, 217.) Once briefing is complete, the Court will consider Defendants' appeal.

representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561-62 (8th Cir. 1982) (quotation marks and citation omitted). However, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M.*, 458 F.3d at 787. The Defendants argue that Named Plaintiffs' claims require individualized inquiries, such that their claims are not typical of the class. This argument overlaps significantly with their arguments on commonality and predominance. *See Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018) (citing *Wal-Mart*, 564 U.S. at 349 n.5 (explaining that the commonality and typicality requirements of Rule 23(a) tend to merge)). For the same reasons the Court rejected Defendants' commonality and predominance arguments, the Court also rejects Defendants' typicality arguments.

The Court finds that the Named Plaintiffs' claims "are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims arise out of the same process as the claims of absent class members. Specifically, they visited the MM Website from a computer in Minnesota, submitted their Minnesota address and banking information, and were matched with a lender that provided a loan with a principal under $1,000. (Aldrich Decl. ¶¶ 6-8; Buettner Decl. ¶¶ 6-9; Kunza Decl. ¶¶ 8-16; Colquitt-Montgomery Decl. ¶¶ 9-12; Rilley Decl. ¶¶ 7-10.) The Court also finds, based upon the allegations in the Second Amended Complaint and this motion, that Named Plaintiffs' legal theories are consistent with those of absent class members. Because Plaintiffs' claims stem from the

same legal theory and seek the same legal remedy as the proposed class, Plaintiffs satisfy Rule 23(a)(3).

## IV.    Adequacy

Rule 23(a)(4) requires plaintiffs to establish that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In evaluating this requirement, courts must "clearly inquire into whether the named representatives (1) 'have common interests with the members of the class[;]' and (2) 'will vigorously prosecute the interests of the class through qualified counsel.'"  *In re Target Corp.*, 847 F.3d at 613 (quoting *Paxton*, 688 F.2d at 562-63).  Furthermore, "the court must diligently aim to 'uncover conflicts of interest between named parties and the class they seek to represent.'"  *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  Courts have generally identified four scenarios in which class representatives may be deemed inadequate:

> (1) the plaintiffs lack personal knowledge concerning the type and extent of damages they have suffered; (2) the plaintiffs lack credibility concerning their claims; (3) the plaintiffs have afforded unfettered discretion to conduct the litigation; and (4) the plaintiffs have physical or mental limitations which may preclude them from being in a position to act in the best interests of the class.

*Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 948 (D. Minn. 2018).

Defendants primarily attack Named Plaintiffs' credibility, arguing that Named Plaintiffs are inadequate "because of serious issues of credibility, irresponsibility and for

some, integrity."[5]  (Doc. No. 161 at 2.)  Defendants point to evidence that the Named

Plaintiffs' declarations in this case are contradictory to their actions since the

commencement of the case.  Specifically, each Named Plaintiff attested that they would

not have taken out a loan if they knew that Defendants did business with unlicensed,

illegal lenders, yet even after becoming Named Plaintiffs, they obtained a number of

payday loans without attempting to learn if any of the lenders were licensed in

Minnesota.  (*Id.* at 20-21.)  Defendants further argue that Named Plaintiffs have a conflict

of interest with absent class members because the Named Plaintiffs hold themselves out

as "among society's financially most vulnerable, obtaining 'last-resort' payday loans for

short-term cures, but which only drive them deeper into debt.  (*Id.* at 20.)  Defendants

contend that Named Plaintiffs' vulnerability will incentivize them to take a quick payday,

in the form of potential statutory damages, rather than "expend their valuable time and

energy for the benefit of absent class members who . . . would be entitled to the same

statutory penalties, who might recover more actual damages than those recoverable by

the class representatives, and who will do so while letting the class representatives take

the laboring oar."  (*Id.* at 20-21.)  Regarding Plaintiff Colquitt-Montgomery, Defendants

point to her conviction for forging a check and admission that she took out a loan

---

[5]      To the extent that Defendants assert Named Plaintiffs lack personal knowledge
concerning damages, the Court finds otherwise.  Named Plaintiffs are knowledgeable of
their claims as evidenced by the declarations that they have filed in this case and the
deposition testimony they have given.  The Court further finds that Named Plaintiffs have
not afforded unfettered discretion to their attorneys to conduct the litigation; rather,
Named Plaintiffs have been active participants since each became a plaintiff.  Finally, the
Court finds that Named Plaintiffs have no physical or mental limitations that may inhibit
their ability to adequately serve as class representatives.

"knowing it did not comply with Minnesota law and therefore she never intended to pay it back" as evidence that she lacks "the moral qualities required of a class representative." (*Id.* at 24.) In sum, Defendants argue that the issues with Named Plaintiffs' adequacy "will distract the jury from considering the merits of the claims as to the missing class members," resulting in "significant prejudice" to the Class. The Court disagrees.

Here, the issues that Defendants raise in attacking Named Plaintiffs' adequacy concern their financial difficulties, which make them typical and representative of people who obtain payday loans. *See, e.g.*, *O'Connor v. Diversified Consultants, Inc.*, Civ. No. 11-1722, 2012 WL 4336204, at *1 (E.D. Mo. Sept. 21, 2012) (rejecting attack on named plaintiff's adequacy for having financial difficulties where financial difficulties were typical of class of people getting calls from debt collectors). The Named Plaintiffs declare that their interests are "common and coextensive" with the proposed class. They attest that they understand their potential roles as class representatives, will responsibly serve as class representatives in this matter, are committed to achieving a satisfactory result for the Class, and do not have any conflicts with absent class members. (*See* Aldrich Decl. ¶¶ 3-5; Buettner Decl. ¶¶ 3-5; Kunza Decl. ¶¶ 3-5; Colquitt-Montgomery Decl. ¶¶ 3-5; Rilley Decl. ¶¶ 3-5.) At this time, the Court finds no reason to question these attestations.

The Court also finds Defendants' reliance on *Sonmore v. CheckRite Recovery*, 206 F.R.D. 257 (D. Minn. 2001), to be misplaced because the procedural posture of *Sonmore* is distinguishable from this case. Specifically, in *Sonmore*, the plaintiffs had already secured $1,000 in statutory damages after a successful motion for summary judgment.

*Id.* at 263. The plaintiffs then moved for class certification. *Id.* The *Sonmore* court therefore had justifiable concerns about the potential class representatives' willingness to pursue claims on behalf of the entire class, when they could instead secure quick payments to which they were entitled. *Id.* The Court is not concerned about that scenario given that this case is at an earlier stage of litigation.

Moreover, to the extent that Defendants suggest Named Plaintiffs' financial issues will affect the prosecution of their case, the Court finds that such issues are purely speculative and further finds that Named Plaintiffs' financial statuses have not caused any problems with the litigation to this point. The Court therefore concludes that any inquiry into Named Plaintiffs' finances is not warranted at this time. *See Dirks v. Clayton Brokerage Co.*, 105 F.R.D. 125, 134 (D. Minn. 1985) ("[C]ourts do not normally examine the financial responsibility of class representatives."). Indeed, this case has been ongoing since March 2014 and, since that time, Plaintiffs Rilley and Kunza have actively participated in the case without any issues. Plaintiffs Aldrich, Colquitt-Montgomery, and Buettner have all been involved since March 2018, and their participation has been free of any concerns.

The Court finds that the Named Plaintiffs have met the requirements of Rule 23(a)(4). Consistent with the Court's analysis of both the commonality and typicality requirements, above, the Court finds that the Named Plaintiffs assert injuries that are common to and typical of those alleged on behalf of the Class. Thus, all of the Named Plaintiffs and the proposed class members share the common goals of obtaining redress for the damages they suffered as a result of securing payday loans via

Defendants' allegedly illegal scheme.

## V.      Superiority

In addition to predominance, Rule 23(b)(3) further requires the court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The rule provides four nonexclusive factors to help determine if a class action is superior:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*  Having considered the relevant factors, the Court finds that a class action is the superior method of adjudication.  First, as to the class members' interests in individually controlling the prosecution of separate actions, the Court finds that such interests are minimal and outweighed by the greater interest in having the claims heard as a class action.  Second, thus far there has been no showing of other litigation against these defendants for the same claims.  Furthermore, minimizing the number of individual lawsuits filed on this basis promotes the interests of judicial economy and efficiency.  Third, concentrating the litigation of these claims in one forum is desirable and will help avoid inconsistent adjudications.  Finally, the Court is not aware of any unusual difficulties that would hamper the management of this class action.

In light of the relevant considerations, the Court concludes that a class action is the superior method for adjudicating these claims pursuant to Rule 23(b)(3).

## CONCLUSION

Resolving Plaintiffs' claims in the context of a class action will fairly promote the interests of the class and will ensure judicial economy. In addition, because this matter challenges Defendants' general payday-lending practices over and above any issues affecting only individual members, a class action will permit the parties to litigate issues common to the class in an economical manner while avoiding duplicative litigation. The Court finds that Plaintiffs have satisfied the requirements of Rules 23(a) and 23(b)(3), and the Court certifies the proposed class.

## ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1.      Plaintiffs' Motion for Class Certification (Doc. No. [113]) is **GRANTED**.

2.      The following class is certified pursuant to Rule 23 of the Federal Rules of Civil Procedure: All individuals residing in Minnesota who (1) received a loan from a lender of $1,000 or less, (2) that required a minimum payment within 60 days of loan origination of more than 25 percent of the principal balance, (3) by using moneymutual.com or any MoneyMutual-branded website, (4) from August 1, 2009 through the date of this Order.

3.      Having considered the requirements of Rule 23(a)(4), the Court appoints Scott Rilley, Michelle Kunza, Venus Colquitt-Montgomery, Jonathon Aldrich, and Kendra Buettner as class representatives.

4.     Having considered the requirements of Rule 23(g) of the Federal Rules of Civil Procedure, the Court appoints E. Michelle Drake and John Albanese of Berger Montague PC and Mark Heaney of Heaney Law Firm, LLC, as class counsel.

5.     The parties shall negotiate the content of the class notice.  Within twenty-one (21) days of the date of this Order, the parties shall submit a joint proposed notice to the Court.  If the parties are unable to agree on the content of the notice, the parties shall each submit a proposed notice, together with briefing not to exceed ten (10) pages per side, within thirty (30) days of the date of this Order.

Dated:  January 11, 2019                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge